UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

№ 12-cv-2970(JFB)(ARL)

---

REYES RODRIGUEZ

Plaintiff,

VERSUS

LONG ISLAND AMERICAN WATER, INC.,

Defendant.

---

**MEMORANDUM AND ORDER**
September 26, 2014

---

JOSEPH F. BIANCO, District Judge:

Plaintiff, a utility man employed by defendant Long Island American Water ("LIAW"), brought this action alleging racial discrimination and retaliation, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and the New York Human Rights Law ("NYHRL"). In particular, plaintiff, who is a Hispanic male, alleges that LIAW terminated him on February 17, 2011, on the basis of his race, and retaliated against him because his wife filed a lawsuit in 2009 alleging that she was denied health benefits due to discrimination.[1]

Defendants now move for summary judgment pursuant to Federal Rule of Civil Procedure 56, arguing that plaintiff cannot establish a prima facie case of unlawful discrimination because (1) the finding by the independent arbitrator that LIAW had just cause to terminate plaintiff should be given great weight; (2) there is no evidence of discriminatory comments or actions; and (3) plaintiff cannot point to any similarly situated employee who received preferential treatment. Defendant also argues that LIAW had a legitimate business reason for terminating plaintiff's employment after an internal investigation—namely, that plaintiff falsified his timesheet on December 4, 2010,

---

[1] Although the complaint makes a conclusory reference to a "hostile work environment," plaintiff did not attempt to argue in his opposition papers (or at oral argument) that he was asserting a separate cause of action for hostile work environment, but rather only argued that summary judgment should be denied on his claim for unlawful termination based on race and his claim for retaliation. Thus, there is no indication that plaintiff intends to assert a separate hostile work environment claim. However, to the extent such a claim is being asserted separately, the Court concludes that there is insufficient evidence from which a rational jury could find a hostile work environment based on race or on plaintiff's wife's protected activity.

in violation of LIAW's policy, and then lied about the falsification of the timesheet when confronted—and that plaintiff has not come forth with any evidence from which a rational jury could find that LIAW's stated reasons are pretextual. Similarly, with respect to the retaliation claim, defendant argues that summary judgment is warranted because there is no evidence to support such a claim.

For the reasons set forth below, the Court grants defendant's motion for summary judgment on the federal claims, and declines to exercise supplemental jurisdiction over the state claims. With respect to the race discrimination claim, as set forth in plaintiff's deposition and as confirmed at oral argument, it is uncontroverted that: (1) plaintiff falsified his timesheet for December 4, 2010, by recording that he was at various work locations during that day when, in fact, he was at the condominium that he was in the process of purchasing in Freeport, New York (where he received a parking ticket); (2) when confronted about the discrepancy on the timesheet, plaintiff lied about his whereabouts and provided additional false information in an effort to continue to conceal his falsification of the timesheet. Plaintiff has offered no evidence to attempt to rebut these legitimate, non-discriminatory reasons for his termination, other than to point to other workers whom he argues committed similar misconduct and were not fired. Having examined the entire record, reviewed the submissions of the parties, and heard oral argument, the Court concludes that no rational jury could find that these alleged comparators were similarly situated to plaintiff. It is uncontroverted that, *inter alia*, the comparators never affirmatively recorded that they were working when they were not and, even more importantly, did not deny their misconduct, or provide false information, when they were confronted. In short, even construing the evidence most favorably to plaintiff, there is no rational basis for a jury to conclude that his termination was based upon his race, rather than his undisputed falsification of a timesheet and repeated lies when questioned.

Similarly, with respect to plaintiff's retaliation claim, there is simply no evidence that could support such a claim. Although plaintiff claims in his complaint (and at his deposition) that LIAW's alleged retaliation in terms of unjustified discipline began soon after his wife's lawsuit, it is uncontroverted that his wife's lawsuit was filed *in 2009*, and the discipline about which he complains (for excessive absences, driving into a light post with his Company vehicle, and failing to stop at a stop sign) occurred *in 2008*, prior to his wife's lawsuit. Moreover, it is uncontroverted that the supervisor who recommended plaintiff's termination was not employed with LIAW at the time of his wife's lawsuit (which was dismissed on August 31, 2010) and did not learn about that lawsuit until *after* plaintiff's termination in February 2011. Thus, there is simply no evidence from which a rational jury could find that plaintiff's termination in February 2011 for admittedly falsifying his timesheet and lying repeatedly about it when confronted, or plaintiff's alleged lack of overtime and training compared to other workers, were acts of retaliation for a lawsuit filed by his ex-wife in 2009.

I. BACKGROUND

A. Factual Background

The Court takes the following facts from the parties' affidavits, depositions, exhibits, and Rule 56.1 Statements of Fact. The Court construes the facts in the light most

2

favorable to the nonmoving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2005). Although the Rule 56.1 statements contain specific citations to the record, the Court cites to the statements rather than to the underlying citations. Unless otherwise noted, where a Rule 56.1 statement is cited, that fact is undisputed or the opposing party has not pointed to any contradictory evidence in the record. Moreover, to avoid repetition, the Court summarizes the facts regarding the allegedly similarly situated employees, as well as certain facts regarding the retaliation claim, in the respective legal analyses for those claims.

Plaintiff began working for LIAW in 1994, and began his most recent position as a utility man in 2000. (Pl. 56.1[2] ¶ 6.) He was responsible for responding to emergencies and performing "flushes" when residents complained of rusty water. (*Id.* ¶¶ 7-8.) When plaintiff was terminated in 2011, his supervisor was James Hahn, who reported to Richard Ruge, LIAW's Manager of Field Services. (*Id.* ¶ 11.) Hahn and Ruge are both white, and plaintiff is Hispanic. (*Id.* ¶ 12.)

Ruge began his employment with LIAW on December 1, 2010. (*Id.* ¶ 12.) Three days later, on December 4, 2010, plaintiff received a parking ticket for parking in a handicapped spot in Freeport, New York. (*Id.* ¶ 29.) The spot is located in front of a building where plaintiff now resides, and at the time, plaintiff was in the process of buying an apartment there. (*Id.*)

---

[2] Throughout this Memorandum and Order, the Court cites plaintiff's "Counter-statement of undisputed material facts pursuant to Local Rule 56.1," which incorporates the statement submitted by defendant and notes any facts disputed by plaintiff.

Plaintiff received the parking ticket at 1:43 p.m., during his workday. On the timesheet that plaintiff submitted for December 4, 2010, he stated that he attended to a "leak" on "Grand Avenue" in Baldwin, New York (with no address identified) from 11:00 a.m. to 12:30 p.m. (*Id.* ¶ 28.) From 12:30 p.m. to 1:50 p.m., plaintiff reported that he was in Woodmere, New York. However, plaintiff does not dispute that he was actually in Freeport at 1:43 p.m. (when he received the parking ticket), that Freeport and Woodmere are in opposite directions from Baldwin (the site of plaintiff's earlier recorded job), and that Freeport is outside of LIAW's service area. (*Id.* ¶¶ 31, 33, 37.)

LIAW learned of plaintiff's ticket when Ruge received a copy of it through LIAW's vehicle leasing company. (*Id.* ¶ 32.) In early February 2011, Ruge began to investigate the circumstances surrounding the ticket. (*Id.* ¶¶ 32-34.) After learning that plaintiff was the driver who received the ticket, Ruge met with plaintiff, his union representative, and a Human Resources staff member to discuss the ticket. (*Id.* ¶ 35.) At the meeting, plaintiff never mentioned that the parking spot where he received the ticket was in front of the apartment he was in the process of purchasing. Instead, he claimed that a road detour on his way to perform a "stack of flushes" led him to Freeport, where he decided to stop for lunch. (*Id.* ¶ 36.) Ruge's investigation showed, however, that there was no evidence of a road detour, no evidence that plaintiff was dispatched to Grand Avenue on December 4, 2010, and no evidence that he completed any flushes that day. (*Id.* ¶¶ 36-41.) In addition, all of plaintiff's cell phone calls on December 4, 2010, between the hours of 8:00 a.m. and 12:16 p.m., originated from a cellular tower in Freeport. (*Id.* ¶ 46.)

Ruge recommended plaintiff's termination,[3] and he was terminated effective February 17, 2011. Plaintiff challenged his termination through his union, and the parties went to arbitration. (*Id.* ¶ 47.) Before the arbitration, plaintiff's union president asked Ruge to grant plaintiff a Last Chance Agreement ("LCA"), which would allow plaintiff to return to work, but Ruge denied the request. (*Id.* ¶¶ 44.2-3.) The arbitrator found that plaintiff was terminated for just cause, namely the falsification of his timesheet, because the timesheet did not reflect the fact that he was in Freeport at 1:43 p.m., and because there was no evidence of his claimed flushes nor of the alleged leak in Baldwin. (*Id.* ¶ 52.) Plaintiff neither alleged, nor presented evidence of, racial discrimination at the arbitration.

B. Procedural History

Plaintiff filed the complaint in this action on June 13, 2012. Defendant moved for summary judgment on December 23, 2013, and plaintiff responded in opposition on February 14, 2014. Defendant replied in further support of the motion on March 7, 2014, and the Court heard oral argument on May 16, 2014.

---

[3] Defendant states that Ruge recommended the termination to William Varley, the President of LIAW, but plaintiff contends that Varley played no role in plaintiff's termination, and that Ruge's recommendations are always followed and carried out by LIAW's human resources department. (Pl. 56.1 ¶¶ 12-13, 43.) Plaintiff contends that Ruge was the decisionmaker with respect to his termination, and defendant has not disputed that contention; in fact, defendant provided evidence that Ruge notified plaintiff of his termination. (Ex. O to Cabrera Decl.) Therefore, the Court considers Ruge to have been the decisionmaker with respect to plaintiff's termination.

II. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may only grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that he or she is entitled to summary judgment. *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some

metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (emphasis in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

The Second Circuit has provided additional guidance regarding summary judgment motions in discrimination cases:

> We have sometimes noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions. *See, e.g.*, *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994). Nonetheless, "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

*Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001)).

### III. DISCUSSION

In his two causes of action, plaintiff asserts separate claims for unlawful termination and for retaliation. Both causes of action are brought under Title VII, 42 U.S.C. § 1981, and the NYHRL. As set forth below, the federal claims, under Title VII and Section 1981, cannot survive summary judgment.

#### A. Termination

The claims based on plaintiff's termination are all analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Mavrommatis v. Carey Limousine Westchester, Inc.*, 476 F. App'x 462, 464 (2d Cir. 2011) (noting that discrimination claims brought pursuant to Title VII and § 1981 are both analyzed under *McDonnell Douglas*).

5

Under *McDonnell Douglas*, "a plaintiff must first establish a *prima facie* case of discrimination." *Ruiz v. Cnty. of Rockland*, 609 F.3d, 486, 491 (2d Cir. 2010).

> In the context of an alleged discriminatory discharge, a plaintiff must show that (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination. . . . Once a plaintiff meets this initial burden, the burden then shifts to the defendant to offer a legitimate nondiscriminatory reason for the termination. . . . If defendant does so, the burden returns to the plaintiff to show that the real reason for plaintiff's termination was his race and national origin.

*Id.* at 491-92 (citations omitted).

Here, defendants argue that plaintiff has failed to establish a *prima facie* case of discrimination with respect to his termination because the comparators he names are not similarly situated to him in all material respects. However, given that the Second Circuit has emphasized the "minimal" nature of the *prima facie* showing, *see Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 128 (2d Cir. 2012), the Court will assume, *arguendo,* that plaintiff has made such a showing, and will proceed directly to the pretext stage of *McDonnell Douglas*, in which it is plaintiff's "ultimate burden" to show that there is a genuine issue of fact with respect to discrimination. *Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2000) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)); *see also Conway v. Microsoft Corp.*, 414 F. Supp. 2d 450, 460 (S.D.N.Y. 2006) (assuming that plaintiff met minimal burden of establishing *prima facie* case by referring to employer's disparate treatment of other employees, and considering similarity of those employees' situation under the final step of *McDonnell Douglas*).

Here, defendants have articulated legitimate, non-discriminatory reasons for the termination: namely, that plaintiff falsified his timesheet for December 4, 2010 (by reporting that he was working in Woodmere when he was actually in Freeport, and by fabricating a leak on Grand Avenue in Baldwin), and lied when responding to questions regarding his activities on December 4, 2010. With respect to plaintiff's repeated lies when confronted about the falsified time entries, defendant notes the following uncontroverted evidence:

> (1) Plaintiff could not explain why he had written on his timesheet that he was working in Woodmere when, in fact, he was in Freeport; (2) Plaintiff claimed that he worked on a leak at 'Grand Ave' in Baldwin, but there was no record of any such leak or any call to Plaintiff dispatching him to Grand Avenue; (3) although Plaintiff claimed that his laptop was not working and therefore he learned about the undocumented leak on 'Grand Avenue' through either the plant dispatcher, police, or fire department, Plaintiff was able to log onto his laptop at the start of his shift and off the laptop at the end, and the employee on the next shift

6

was also able to log on without issue; (4) Plaintiff claimed that he had completed flushes in Roosevelt, but there was no record of Plaintiff completing any flushes that day; and (5) while Plaintiff claimed he learned about the leak in Woodmere after stopping in Freeport for lunch (which would have been after 1:43 p.m.), LIAW's call center had a record of calling Plaintiff at 12:09 p.m. and 12:13 p.m., before Plaintiff purportedly stopped for lunch.

(Def. Mem. at 14 (citing Def. 56.1 ¶¶ 30-31, 37, 40-42, 45-52).)

Moreover, defendant hired an investigator who obtained the following uncontroverted evidence of plaintiff's false excuses when confronted with his timesheet for December 4, 2010:

> (1) [A]lthough Plaintiff claimed that a detour on the Sunrise Highway led him to the town of Freeport, the local police department had no record of any such detour on Sunrise Highway on December 4, 2010; (2) all of Plaintiff's phone calls from 8:00 a.m. until 12:16 p.m., on December 4 originated from a cell phone tower in Freeport, and not in Valley Stream, Atlantic Beach, Baldwin, and Woodmere, where Plaintiff claimed to be during those times on his timesheet; and (3) Plaintiff's cell phone records did not show any calls received from the Plant Operator, or the police or fire department (whom Plaintiff claimed called him to tell him about the leak on Grand Avenue).

(*Id.* (citing Def. 56.1 ¶¶ 45-46).) Defendant also notes that plaintiff admitted to testifying untruthfully at the arbitration about his reasons for stopping in Freeport, which have varied throughout the history of this case. (Def. 56.1 ¶¶ 54-55.).

Plaintiff does not dispute that Ruge was responsible for his termination, and that Ruge's stated reason for firing plaintiff was plaintiff's falsification of his timesheet and lying when confronted about it. Moreover, in the context of this lawsuit, plaintiff has now admitted that he falsified the timesheet on December 4, 2010. (*See* Pl. Mem. Opp. at 2 ("Admittedly, Plaintiff violated company policy and left company territory while he was on duty and did not document his whereabouts on his time sheet.").) Plaintiff also admitted that he did not testify truthfully at the arbitration, and has failed to provide any explanation for the numerous inconsistent stories that he told to the Company when confronted with his false timesheet for that day. At oral argument, plaintiff's counsel acknowledged that plaintiff had falsified the timesheet and "was not forthcoming" when confronted by his employer with the false timesheet.[4] Moreover, plaintiff has not argued that defendant has failed to articulate non-discriminatory reasons for the termination,

---

[4]At the oral argument on May 16, 2014, the Court and plaintiff's counsel had the following exchange:

> COURT: It's undisputed that your client falsified a timesheet, right?
>
> PLAINTIFF'S COUNSEL: That's correct.
>
> COURT: And it's undisputed that, when confronted about it, he lied about it, right?
>
> PLAINTIFF'S COUNSEL: He was not forthcoming, correct.

7

and the Court agrees that defendant has met its burden under the second step of *McDonnell Douglas*. *See Bengard v. United Parcel Serv.*, 48 F. App'x 350, 352-53 (2d Cir. 2002) (affirming grant of summary judgment on disparate treatment claim where employer's stated reason was that the plaintiff falsified his timesheets). Instead, plaintiff's arguments focus on pretext (Pl. Mem. Opp. at 10), and accordingly, so does the Court's discussion.

Plaintiff attempts to establish pretext by pointing to evidence concerning white employees who, he argues, committed similar misconduct, but were not terminated. "A plaintiff in a discrimination action may establish that the reason articulated by a defendant for termination of plaintiff's employment is a pretext and that race, in fact, did play a part in the decision to terminate by proving that 'similarly situated' white employees were treated more favorably than he." *Hargett v. Nat'l Westminster Bank, USA*, 78 F.3d 836, 839 (2d Cir. 1996). "While the determination of "[w]hether two employees are similarly situated ordinarily presents a question of fact for the jury," *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000), "[t]his rule is not absolute . . . and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001) (citing *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 568 (2d Cir. 2000), *superseded on other grounds as stated by Jones v. N.Y. State Metro D.D.S.O.*, 543 F. App'x 20, 22 (2d Cir. 2013)); *accord Ruiz*, 609 F.3d at 494-95. Thus, "when a plaintiff's misconduct is objectively more serious than that of a proposed comparator, differential treatment by the employer does not create an issue of fact that will defeat a motion for summary judgment." *Conway*, 414 F. Supp. 2d at 464 (collecting cases).

When a plaintiff identifies other individuals treated differently by the employer, he must show that they were similarly situated "in all material respects," which "varies somewhat from case to case." *Graham*, 230 F.3d at 40. The similarity of a comparator's situation "must be judged based on (1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." *Id.* (citation omitted). "In other words, there should be an objectively identifiable basis for comparability . . . [meaning] a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." *Id.*

Although courts' analyses of whether there is an "objectively identifiable basis for comparability" has varied from case to case, certain factual distinctions are commonly noted. Under the first ("workplace standards") prong, "[i]n the Second Circuit, whether or not co-employees report to the same supervisor is an important factor," which includes whether the same decisionmaker investigated and took action with respect to the plaintiff's misconduct. *Conway*, 414 F. Supp. 2d at 465-66. Under the second ("conduct") prong, courts consider both the seriousness of the employee's acts when compared with the acts of other employees, as well as the context in which those acts occurred. *Graham*, 230 F.3d at 40. Here, plaintiff compares his conduct to three other incidents involving (1) a co-worker named

8

William Causey; (2) an entire crew of LIAW workers; and (3) a co-worker named Warren Hammer. Each is discussed in turn.[5]

1. Causey

William Causey was a white co-worker of plaintiff's who received a parking ticket in the exact same parking lot as plaintiff, approximately two months later. (Pl. 56.1 ¶¶ 87-89.) Causey's ticket was also received during working hours, and he did not document his trip to Freeport on his timesheet. (*Id.*)

Under the first prong for considering the similarity of plaintiff's and Causey's situations, the "workplace standards" prong, plaintiff and Causey were subject to the same workplace standards because Ruge investigated and made a decision concerning the misconduct in both cases. In fact, Ruge made the same recommendation in both cases: he recommended that both plaintiff and Causey be fired. (Pl. 56.1 ¶ 87 (stating that it is undisputed that "Ruge initially recommended that the Company terminate Causey because he received a parking ticket outside of LIAW's territory and failed to document his whereabouts for that day").)

It is under the second prong (the "conduct" prong) that plaintiff's argument with respect to Causey fails. Causey's conduct—though analogous in the abstract because he received a parking ticket in the same location as plaintiff—was not of comparable seriousness in light of all the circumstances. Two material—and undisputed—facts distinguish Causey's conduct from plaintiff's. First, after Ruge recommended that Causey be fired for traveling to Freeport on company time, Causey's supervisor told Ruge that he had instructed Causey to give something to plaintiff, who lived in Freeport. Although plaintiff disputes what exactly was said between the supervisor and Causey, he does not dispute that the supervisor's instruction was Causey's reason for traveling to Freeport, and he does not dispute that Causey gave him the item in question.[6] (*Id.* ¶ 89.) In other words, plaintiff does not dispute that Causey's trip to Freeport on company time was for a different reason that

---

[5] Although there are references to other comparators in the record, plaintiff only named these three comparators in the complaint, and only addressed these three comparators in his opposition to defendant's motion. Having examined the entire record to determine whether plaintiff has satisfied his ultimate burden, the Court concludes that there is no evidence of an LIAW employee who was similarly situated to plaintiff and treated differently.

[6] At oral argument, plaintiff's counsel attempted to argue that Causey's affidavit places all of these facts in dispute. The Court disagrees. Causey states in his affidavit that his supervisor, James Hahn, "directed [him] to give Plaintiff a certain phone number, but did not specify in what manner." (Causey Aff. ¶ 8.) Causey adds that his supervisor never directed him to travel to Freeport to give plaintiff the phone number at his residence and, thus, he was not authorized to be in Freeport. Thus, even if Causey was not given specific permission to travel to Freeport during the work day, it is undisputed (even by Causey) that what caused him to go see plaintiff in Freeport was a request from his supervisor that he give a phone number to plaintiff. In contrast, it is undisputed that plaintiff was not in Freeport to deliver a note for a supervisor or as a result of any interaction with a supervisor; rather, it was not for any work-related reason. Moreover, regardless of Causey's version of his interactions with Hahn, there is absolutely no evidence to controvert Ruge's statement that Hahn told him "that he had asked Mr. Causey to travel to Freeport to give a document to Mr. Rodriguez" and "[i]t was not clear whether Mr. Causey understood that he should have traveled to meet Mr. Rodriguez after his shift." (Ruge Decl. ¶ 31.)

9

plaintiff's, who went there without any interaction with a supervisor, and instead made the trip in connection with an apartment he was attempting to buy. (*Id.* ¶ 29.) Ruge recognized the distinction between these two situations when he awarded Causey an LCA,[7] and the Court also concludes that the role of the supervisor, whatever his exact comment to Causey, makes Causey's conduct comparably less serious.

In addition, the chronology of Causey's LCA is significant. Ruge initially recommended Causey's termination, just like he did for plaintiff, and Causey was terminated, just as plaintiff was. (*Id.* ¶¶ 87-89; Ex. C to Cabrera Decl. at 56; Ex. C to Ruge Decl.) Only after Ruge terminated Causey did Causey's supervisor inform Ruge of how Causey may have misinterpreted his comment, which led Ruge to grant Causey an LCA.[8] (Ruge Decl. ¶¶ 31-32.) In plaintiff's case, there was simply no comparable post-termination information brought to light. Thus, the involvement of Causey's supervisor not only distinguishes the seriousness of Causey's conduct, but also demonstrates Ruge's lack of discriminatory animus: he treated both cases the same, until a significant factual distinction arose in Causey's case, which justified bringing him back from termination.[9]

The second material distinction between the seriousness of Causey's and plaintiff's conduct is that plaintiff affirmatively falsified his timesheet and continued to lie about it when confronted, while Causey simply omitted his trip to Freeport. Although plaintiff argues that this distinction is semantic, because an omission necessarily suggests that an employee was in the recorded location when he was not, the undisputed evidence in the record shows that plaintiff, unlike his comparators, affirmatively told lies and continued to tell them when confronted. For example, plaintiff does not dispute that he entered the Grand Avenue job and location on his timesheet, and there is no evidence that the job ever occurred. (Pl. 56.1 ¶¶ 28-41.) Furthermore, he does not dispute the evidence that the flushes he reported never occurred, that there was no road detour (as he claimed in the initial meeting with Ruge as his reason for going to Freeport in the first place), and that his cell phone calls originated from Freeport throughout the entire morning that he reported working in

---

[7] Plaintiff has submitted an affidavit by his union president stating that the award of an LCA was "customary practice . . . as a probationary period, and a mechanism to allow [union members] to return to work" after misconduct. (Pl. Ex. I ¶ 7.) However, defendant submitted evidence that, in the past ten years, LIAW offered LCAs to only three of the eleven employees who were terminated from the same office as plaintiff, and several of those not offered LCAs were white. (Decl of William Varley ¶ 4.) Plaintiff has identified no evidence to dispute these statistics, and the union president's conclusory statement does not create a genuine issue for trial.

[8] Although plaintiff's counsel contended at oral argument that this fact is disputed, there is no evidence offered by plaintiff to contradict (1) the termination letter for Mr. Causey dated April 1, 2011, and (2) Ruge's declaration regarding the information Hahn supplied after he terminated Causey, which caused him to give Causey the LCA after the termination.

[9] Causey was ultimately fired by Ruge the same year as plaintiff, for violating his LCA, which further demonstrates that there is no genuine issue of fact concerning Ruge's attitude toward Causey as opposed to plaintiff.

various locations. (*Id.* ¶¶ 41-46.) Plaintiff also does not dispute that his explanations for the trip to Freeport differed during the internal investigation, the arbitration, and his deposition, which caused Ruge to expend additional investigative resources. (*Id.* ¶¶ 53-56.) There is no evidence that LIAW had to investigate and disprove multiple acts of affirmative dishonesty in Causey's case, because he was not accused of fabricating his whereabouts in that manner.

In his papers and at oral argument, plaintiff suggests that, when two employees have issues with their timesheets and are subject to differing discipline, the issue of whether they are similarly situated must be decided by a jury. The Court disagrees. The uncontroverted evidence of the differing circumstances surrounding the timesheet issues may make it clear that no rational jury could find that the two employees were similarly situated. *Cf. Thomas v. Dep't of Corr. for Ga.*, 377 F. App'x 873, 880 (11th Cir. 2010) (distinguishing two employees who both falsified timesheets, and affirming summary judgment for employer); *see also Espitia v. Procter & Gamble Co.*, 93 F. App'x 707, 710-11 (6th Cir. 2004) ("The two other employees who were not terminated for not reporting their tardy arrivals were not similarly situated because coming to work late is quite different from leaving work for several hours in the middle of the day. Not reporting tardiness indicates carelessness, while not reporting a three-hour mid-day absence indicates something worse.").

In fact, numerous courts have noted that an employee who lies about his or her timesheets when confronted is materially different from an employee who submitted a false timesheet but admitted the misconduct when confronted. *See, e.g.*, *Dean v. Kraft Foods N. Am., Inc.*, No. Civ.A.02-8609, 2005 WL 1793532, at *8 (E.D. Pa. July 27, 2005) ("Further, although submitting a false time sheet is an act of dishonesty similar to Dean's alleged wrongful conduct, there are significant differences that may explain why the white employee was ultimately retained. Unlike Dean, who admittedly lied to her supervisors, there is no element of insubordination involved in submitting a false time sheet."); *Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 44 (1st Cir. 2001) ("Yet more importantly, unlike Straughn, *Higgins forthrightly acknowledged his misconduct when first confronted*, whereas Straughn repeatedly attempted to deceive Giglio." (emphasis in original)).

Thus, courts have granted summary judgment for the employer in circumstances closely analogous to those present here— namely, where the comparator employee (unlike the plaintiff) did not lie about the misconduct when confronted. For example, in *Vigil v. Colorado Department of Higher Education*, the plaintiff claimed that his termination for falsifying overtime records was a pretext for retaliation and, in attempting to show pretext, pointed to other employees who had also submitted inflated overtime reports, but were not terminated. No. 98-1174, 1999 WL 407479, at *5-6 (10th Cir. 1999). In finding that summary judgment for the employer was warranted, the Tenth Circuit explained that plaintiff was not similarly situated to the other employees because, unlike the other employees, he had lied about the misconduct:

> The undisputed facts show that plaintiff was not similarly situated to [the other employees who were not terminated] because defendant not only accused [plaintiff] of violating a workplace rule by submitting an

inflated overtime report, it also accused him of subsequently lying about his alleged misconduct. Throughout defendant's investigation, plaintiff and [another worker who was terminated] repeatedly denied any wrongdoing, asserting that they worked all hours reported performing a system backup. Defendant ultimately concluded that they were lying about their overtime since no computer records existed of the purported system backup. The accusation that [plaintiff] remained untruthful aggravated his offense and distinguished the seriousness of his conduct from that of [the other employees who were not terminated], thereby justifying more severe punishment.

*Id.* at \*6.

Similarly, in *David v. Donahoe*, plaintiff argued that her reduction in grade because of her falsification of time records was based on her gender because a male employee who had falsified time entries was given a last-chance agreement with no demotion. No. 11 C 3720, 2013 WL 676243, at \*7 (N.D. Ill. Feb. 25, 2013). In granting summary judgment for the employer, the court explained that the plaintiff was not similarly situated to the other employee because she had repeatedly lied about her misconduct:

In sum, [plaintiff] is not similarly situated to [the other employee] because [plaintiff] repeatedly denied improperly changing TACS time entries even though the OIG agents, Davis, and Pugh all believed that she had done so. [The other employee], by contrast, after initially providing false statements about time-entry changes he made in TACS, provided investigators and his supervisors with what they believed were truthful statements. [Plaintiff's] continued denials distinguish her conduct from [the other employee's]. . . . Thus, [plaintiff] has failed to show that [the other employee] is an appropriate comparator and, therefore, has failed to establish a *prima facie* case of gender discrimination.

*Id.* at \*9; *see also Terry v. Sedgwick, Detert, Moran & Arnold*, 66 F. App'x. 25, 27 (7th Cir. 2003) (affirming summary judgment for employer in race discrimination case where plaintiff was discharged for failing to deliver package to mailroom and lying about it, and noting that plaintiff was not similarly situated to another employee who had not been warned and had admitted to mistake); *Jackson v. Ill. Dep't of Human Servs.*, No. 07-CV-0692-MJR, 2009 WL 1259082, at \*3 (S.D. Ill. April 30, 2009) (denying motion for reconsideration of summary judgment motion, and noting that plaintiff was not similarly situated to other employees who had committed similar misconduct because plaintiff lied during investigation).

Accordingly, given the uncontroverted evidence in this case, no rational jury could find that plaintiff and Causey were similarly situated in all material respects because, among other things, (1) Causey was in Freeport because of a request by his supervisor (even if express permission to travel to Freeport during the work day was not given), while plaintiff had no reason to be in Freeport; and (2) plaintiff's affirmative lies (even after being confronted with the timesheet) were more serious than Causey's

omission. Given these distinctions, and the absence of any other evidence in the record to support any inference of discrimination, a rational jury could not conclude that defendant's choice not to give plaintiff an LCA was motivated by unlawful discrimination.[10]

2. The Crew

Plaintiff also argues that he is similarly situated to a crew of LIAW employees ("the Crew") who went together to one employee's home, on company time, in order to move dirt with company equipment. Like plaintiff, these employees did not report the trip on their timesheets, but unlike plaintiff, there is no evidence that they affirmatively falsified a job in order to cover the time. Also unlike plaintiff, the Crew had a supervisor's permission to perform the work on its way back to the LIAW yard (Ex. D to Cabrera Decl. at 55), and plaintiff has not identified any contrary evidence. In fact, his account reflects the same basic understanding of the event. (Ex. B to Cabrera Decl. at 213-14 ("Mr. Reckiter said to all of us, 'We were caught at my son's house bringing out dirt and we just dropped by to pick up some dirt and bring it back to the yard.'").) Moreover, unlike plaintiff, there is no evidence that the Crew was confronted about this conduct and repeatedly lied about it. Therefore, based on a comparison of their conduct, plaintiff is not similarly situated to the Crew.

Plaintiff's comparison to the Crew also fails under the "workplace standards" prong, because Ruge was not employed at LIAW when this incident occurred. As noted above, "[i]n the Second Circuit, whether or not co-employees report to the same supervisor is an important factor in determining whether two employees are subject to the same workplace standards for purposes of finding them similarly situated." *Conway*, 414 F. Supp. 2d at 465 (citing cases); *see also Shumway*, 118 F.3d at 64 ("None of the individuals Shumway claims violated the 'no fraternization' policy were supervised by Gregory McGraw or Jerome Johnson."); *Martinez-Santiago v. Zurich N. Am. Ins. Co.*, No. 07 Civ. 8676(RJH), 2010 WL 184450, at *8 (S.D.N.Y. Jan. 20, 2010) ("In order to be similarly situated . . .other employees must have had the same supervising team leader as the plaintiff. . . . [because] [e]ach team leader might use his or her discretion differently."). Plaintiff has not shown that the disparate treatment of the Crew by a different supervisor demonstrates discrimination by Ruge; on the contrary, in his deposition Ruge did not defend or distinguish the Crew's conduct, and appeared to agree that he would also have treated the Crew's conduct as falsification of records. (Pl. Ex. D at 65.) Accordingly, a rational jury could not conclude, based upon this materially different incident, that Ruge discriminated against plaintiff in terminating him.

3. Hammer

Plaintiff also argues that he is similarly situated to Warren Hammer, who was disciplined but not terminated for collecting recyclable bottles using his company truck, while on company time. (Pl. 56.1 ¶ 82.)

---

[10] In connection with the LCA, to the extent plaintiff points to the fact that Causey's history at LIAW also included having run a red light at a high rate of speed, no inference of discrimination arises from the decision not to terminate him for that conduct, because plaintiff had similar traffic infractions in 2008 (such as driving into a light post and failing to stop at a stop sign), and plaintiff also was not terminated after those events.

Like the incident involving the Crew, the incident involving Hammer occurred before Ruge worked at LIAW. Ruge testified that he did not know what LIAW's policy was in 2007 (when Hammer was disciplined), but he stated that, if his investigation revealed similar facts, he would have taken the same action against Hammer that he took against plaintiff. (Pl. Ex. D at 89.) This testimony corresponds with Ruge's testimony concerning the Crew, and with the fact that Ruge took the same initial action against Causey as against plaintiff, before the distinguishing fact of Causey's supervisor's involvement came to light. Thus, Ruge appears to apply a consistent policy of recommending termination when an employee falsifies timesheets, and plaintiff has identified no evidence to the contrary.

Plaintiff's comparison to Hammer also fails under the "conduct" prong. Defendants offered evidence that, once questioned, Hammer explained that he collected the recyclable products during his lunch hour (Ex. D to Cabrera Decl. at 51), and plaintiff has not identified any evidence to the contrary. Thus, like Causey, Hammer presented a plausible mitigating explanation for his conduct, unlike plaintiff, whose story continued to shift. The Court, therefore, concludes that plaintiff's conduct was comparatively more serious than Hammer's, such that they were not similarly situated in all material respects.

### B. The Arbitration Decision

Thus far, the Court has analyzed plaintiff's claims and the record without reference to the arbitrator's decision that defendant terminated plaintiff for just cause. However, as one of the grounds for its motion, defendant also argues that the independent arbitrator's finding that LIAW had just cause to discharge plaintiff is entitled to great weight. In particular, defendant notes that, pursuant to the union's collective bargaining agreement, on June 27, 2011, a neutral arbitrator held a hearing wherein plaintiff presented evidence and his own testimony. Following the hearing, the arbitrator issued a detailed seventeen-page opinion finding that LIAW terminated plaintiff for just cause. In the opinion, the arbitrator explained that he had approached the case "in a manner analogous to the approach utilized by the courts and the EEOC in discrimination cases." (Pl. 56.1 ¶ 52.)

The Court concludes, in its discretion, that the arbitrator's decision "is highly probative of the absence of discriminatory intent in [plaintiff's] termination." *Collins v. N.Y.C. Transit Auth.*, 305 F.3d 113, 119 (2d Cir. 2002). Obviously, "a negative arbitration decision rendered under a CBA does not preclude a Title VII action by a discharged employee." *Id*. However, as the Second Circuit has emphasized, "[w]here, as here, that decision follows an evidentiary hearing and is based on substantial evidence, the Title VII plaintiff, to survive a motion for summary judgment, must present strong evidence that the decision was wrong as a matter of fact—e.g., new evidence not before the tribunal—or that the impartiality of the proceeding was somehow compromised." *Id*.; *accord Attard v. City of New York*, 451 F. App'x 21, 24 (2d Cir. 2011) (quoting *Collins* and noting that courts may accord such weight to an arbitration decision as they deem appropriate).

Plaintiff suggests that an arbitrator's decision is entitled to no weight if the discrimination claim was not presented to the arbitrator. The Court disagrees. Although the Court, in analyzing what

weight to give the arbitrator's decision, should consider whether the plaintiff's discrimination claim and purported evidence in support of that claim were specifically presented to the arbitrator, the failure to present that claim and/or evidence does not mean that the decision has no weight. *See, e.g.*, *Rommage v. MTA Long Island R.R.*, No. 08-cv-836(DLI)(ALC), 2010 WL 4038754, at *12 (E.D.N.Y. Sept. 30, 2010) ("[T]he fact that the arbitrator did not hear plaintiff's discrimination claims does not discount the arbitrator's findings.") (collecting cases). Instead, as the Second Circuit made clear in *Collins*, the Court should consider whether the new evidence not before the arbitrator presents strong evidence that the decision was wrong. *See Spell v. United Parcel Serv.*, No. 09 Civ. 4375(BMC)(CLP), 2012 WL 4447385, at *2 (E.D.N.Y. Sept. 25, 2012) ("[T]he law is clear that [plaintiff's] failure to raise his discrimination claims before the arbitrator is 'immaterial' to whether the arbitral determination should be given substantial weight. . . . Given the arbitration decision's high probative value, the Court must next consider whether plaintiff offers 'strong evidence' which might allow him to survive summary judgment." (citations omitted)).

In the instant case, for reasons previously discussed, the "new evidence" submitted by the plaintiff—that is, the comparator evidence—does not provide strong evidence that the arbitrator's decision was wrong. *See, e.g.*, *Spell*, 2012 WL 4447385, at *2 ("Plaintiff argues that comparator evidence showing that similarly situated white employees were treated differently is sufficient to overcome the probative weight of the arbitral finding. However, the comparators he offers, are not, in fact, similarly situated."); *Delia v. Donahoe*, 862 F. Supp. 2d 196, 221-22 (E.D.N.Y. 2012) (same). In any event, even if the Court gave absolutely no weight to the arbitration decision, the Court would reach the same conclusion for the other reasons discussed herein; namely, there is insufficient evidence in the record for a rational jury to conclude that defendant's termination decision was a pretext for race discrimination.

C. Other Disparate Treatment Claims

In his opposition to defendant's motion, plaintiff also argues that, apart from his firing, defendant subjected him to two additional adverse employment actions: defendant allegedly denied him the same opportunities for (1) overtime and (2) training as his non-Hispanic colleagues.

1. Overtime

The deprivation of overtime was not alleged in the complaint, but in an abundance of caution, the Court will consider the claim because both parties referred to it in their statements of undisputed facts. Plaintiff alleges that, unrelated to his ultimate termination, his white supervisor Vinnie Lance refused to allocate overtime to plaintiff in 2009 and 2010, while he gave it to all of the white members of plaintiff's unit. (Pl. 56.2 ¶ 61.) Lance was not plaintiff's supervisor at the time of his firing and is not alleged to have had any connection with it. Moreover, plaintiff concedes that, when he complained about the denial of overtime to his union representative, the situation was resolved. (*Id.*)

Plaintiff's vague allegation, which does not identify any specifics concerning the overtime allegedly denied (for example, no comparison of the overtime granted to his

white colleagues), is insufficient to carry plaintiff's claim past the third and fourth elements of a *prima facie* case. It is unclear whether plaintiff even suffered an adverse employment action, and if he did, there is no evidence that it occurred under circumstances giving rise to an inference of discrimination. "A plaintiff sustains an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment." *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000). "To be 'materially adverse' a change in working conditions must be more disruptive than a mere inconvenience." *Id.* (internal quotation marks and citations omitted).

Plaintiff attempts to show material adversity here with the conclusory statement that his "income was significantly less than his white co-workers . . . for a significant period of time" (*id.* ¶ 61.7), but he identifies no evidence or specific facts to support that comparison. His unsupported speculation—based only on his affirmation and no other evidence in the record—is lacking in the "concrete particulars" required for a non-movant to avoid summary judgment, *R.G. Grp.*, 751 F.2d at 77, especially considering that his complaint appears to have been immediately resolved. A rational jury simply could not conclude that, despite the immediate resolution of plaintiff's complaint, the denial of an unspecified amount of overtime constitutes unlawful discrimination, particularly where there is no other evidence of the denial besides plaintiff's own conclusory affirmation.[11]

*Anderson*, 477 U.S. at 256 ("Rule 56(e) itself provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials . . . but must set forth specific facts showing that there is a genuine issue for trial. . . . [T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment. This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery."); *Harding v. Wachovia Capital Markets, LLC*, 541 F. App'x 9, 12 (2d Cir. 2013) ("Where the plaintiff fails to adduce evidence of discrimination, pretext or an inference of discrimination cannot arise from defendants' mere failure to produce contemporaneous evidence."); *cf. Little v. Nat'l Broad. Co., Inc.*, 210 F. Supp. 2d 330, 379 (S.D.N.Y. 2002) ("Muro has produced evidence that he incurred an actual loss in income because of lost overtime and that he was forced to work undesirable shifts with an erratic schedule. This evidence, if true, could prove that Muro was subject to an adverse employment action."). Accordingly, any separate claim based on the alleged deprivation of overtime does not establish a *prima facie* case under *McDonnell Douglas*, and the Court grants summary judgment to defendant.

2. Failure to Train

Plaintiff's allegations concerning the denial of training opportunities are likewise

---

[11] The primary case plaintiff cites for the proposition that the denial of overtime is an adverse employment action also supports the Court's conclusion that plaintiff has failed to raise a genuine issue of material fact with respect to his overtime claim. *See Mazyck v. Metro. Transp. Auth.*, 893 F. Supp. 2d 574, 589 (S.D.N.Y. 2012) (granting summary judgment because plaintiff "has not submitted concrete evidence").

16

unconnected with his firing, and are similarly vague and unsupported. "The denial of training opportunities is an adverse employment action only when an employee can show material harm . . . such as a failure to promote or a loss of career advancement opportunities." *Anyanwu v. City of New York*, No. 10 Civ. 8498(AJN)(THK), 2013 WL 5193990, at *21 (S.D.N.Y. Sept. 16, 2013). In other words, "[d]enial of training, without a showing of some injury therefrom, cannot alone constitute an adverse employment action." *Hadman v. Sebelius*, No. 09-CV-4414(ARR), 2011 WL 4736972, at *5 (E.D.N.Y. Oct. 6, 2011).

Plaintiff has not alleged, much less identified evidence of, any failure to promote or gain career opportunities as a result of defendant's alleged failure to train him. The training on which plaintiff focuses was related to the use of his laptop,[12] and plaintiff concedes that he did not attend work the day it was offered. (Pl. 56.1 ¶ 57.) Plaintiff does not identify evidence (i) that the training was denied to him on other occasions, (ii) that he remained untrained because of his race, or (iii) that his career was affected in way by the missed laptop training. Plaintiff's only allegation in this respect is that he received a single "verbal warning" about his unfamiliarity with the laptop,[13] but plaintiff cites no evidence to dispute the fact that the only negative event in plaintiff's career after he missed the laptop training—his firing—occurred because he falsified records, not because of any lack of training on the laptop. *See Argus v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) ("Such testimony, unsupported by documentary or other concrete evidence of the supposed lead line effect, is simply not enough to create a genuine issue of fact in light of the evidence to the contrary."); *Hadman*, 2011 WL 4736972, at *7 ("The record contains no evidence of the NRL's promotional practices, and plaintiff's claim that, after the training course, she would perform better, receive more high-profile assignments, and be promoted as a result are speculative. As these hypotheses are not supported by admissible evidence, they cannot create a genuine dispute as to any material fact sufficient to defeat summary judgment."). Therefore, any separate claim based on a failure to train does not establish a *prima facie* case under *McDonnell Douglas*, and the Court grants summary judgment to defendant.

D. Retaliation

Plaintiff also alleges that defendant subjected him to a hostile work environment in retaliation for his participation in a lawsuit brought by his wife against LIAW.[14]

---

[12] Although not alleged in the complaint, plaintiff refers in his motion papers to the denial of other opportunities for training in digging and ergonomics. However, as with the laptop training, plaintiff does not identify any evidence that he sought this training and was denied it, nor that it caused any material harm to his career. Notably, plaintiff does not dispute that he "cannot recall the specific classes he believes he was excluded from." (Pl. 56.1 ¶ 78.) In addition, plaintiff had bid for and received a light-duty position, and he has not identified evidence that the digging and ergonomic training even applied to his job. (*Id.* ¶ 6.)

[13] Plaintiff conceded in his deposition that the warning was not a "formal corrective action." (Ex. B. to Cabrera Decl. at 57.)

[14] In the complaint, plaintiff's retaliation claim was based mainly on an allegation that defendant subjected plaintiff to "unjustified discipline and harassment from co-workers and supervisors." (Compl. ¶ 10.) However, plaintiff now concedes that

"To state a claim for retaliation in violation of Title VII, a plaintiff must plead facts that would tend to show that: (1) she participated in a protected activity known to the defendant; (2) the defendant took an employment action disadvantaging her; and (3) there exists a causal connection between the protected activity and the adverse action." *Patane*, 508 F.3d at 115.

Plaintiff's claim fails along all three elements of the retaliation cause of action. First, plaintiff does not dispute that Ruge, the decisionmaker with respect to his termination, did not work for LIAW when plaintiff's wife initiated her lawsuit, and did not learn about the existence of the lawsuit until after plaintiff's termination. (Pl. 56.1 ¶ 72.) Moreover, plaintiff has not identified evidence of a single supervisor or anyone in management with knowledge of plaintiff's support for his wife's lawsuit. (*Id.* ¶ 71 (noting it is undisputed that "Neither Plaintiff's supervisors nor anyone in management said anything to Plaintiff about his wife's lawsuit.").) The individuals plaintiff identifies with actual knowledge of his role in the lawsuit are his co-workers, not supervisors. (*Id.* ¶ 70.) Plaintiff also attempts to impute knowledge to LIAW President William Varley, but the evidence plaintiff identifies of Varley's knowledge is simply that Varley took business trips with plaintiff's union representative, Shawn Garvey, at unspecified times, and that Garvey knew of plaintiff's role in his wife's suit. (*Id.* ¶ 67, 70.) Thus, the argument that Varley knew of plaintiff's wife's lawsuit is speculative and conclusory. *See Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (noting that employment discrimination plaintiff will not meet ultimate burden "through reliance on unsupported assertions" or "on the basis of conjecture or surmise" (internal quotation marks and citations omitted)).

Plaintiff's retaliation claim also fails under the second and third elements because he has not identified evidence of any adverse actions taken against him which occurred *because of* his support for his wife's lawsuit. In particular, plaintiff does not allege, much less identify, any evidence of any adverse action taken by Varley, the only supervisor with knowledge of the suit, after the suit was filed in 2009. By way of comparison, in the case which plaintiff argues is "most analogous" to his case (Pl. Mem. Opp. at 20), the husband of a complainant was suspended for three days. *See Murphy v. Cadillac Rubber & Plastics, Inc.*, 946 F. Supp. 1108, 1118 (W.D.N.Y. 1996). Plaintiff cites nothing analogous in the record; in fact, the only post-2009 action documented in the record is plaintiff's firing, which was conducted by Ruge, who lacked knowledge of the lawsuit.[15] Therefore, a rational jury could not conclude that defendant retaliated against plaintiff for supporting his wife's complaint of discrimination, and the Court grants

---

the disciplinary incidents highlighted in the complaint, which occurred in 2008 (*id.* ¶ 11), pre-dated the filing of his wife's lawsuit in 2009 (Pl. 56.1 ¶ 74). The record does not reflect any disciplinary actions involving plaintiff after 2008. (*Id.* ¶¶ 13-22.)

[15] To the extent plaintiff claims in his complaint (and at his deposition) that LIAW's alleged retaliation in terms of unjustified discipline began soon after his wife's lawsuit, it is uncontroverted that his wife's lawsuit was filed *in 2009*, and the discipline about which plaintiff complains (for excessive absences, driving in to a light post with his Company vehicle, and failing to stop at a stop sign) occurred *in 2008*, prior to his wife's lawsuit.

summary judgment to defendant on the retaliation claim.

E.  State Law Claims

Plaintiff's complaint also asserts claims under New York law. Having determined that the federal claims do not survive summary judgment, the Court concludes that retaining jurisdiction over any state law claims is unwarranted. *See* 28 U.S.C. § 1367(c)(3); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). "In the interest of comity, the Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of pursuant to Rule 12(b)(6) or summary judgment grounds, courts should 'abstain from exercising pendent jurisdiction.'" *Birch v. Pioneer Credit Recovery, Inc.*, No. 06-CV-6497T, 2007 WL 1703914, at *5 (W.D.N.Y. June 8, 2007) (quoting *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir. 1986)).

Therefore, in the instant case, the Court, in its discretion, "'decline[s] to exercise supplemental jurisdiction'" over plaintiff's state law claims because "it 'has dismissed all claims over which it has original jurisdiction.'" *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting 28 U.S.C. § 1367(c)(3)); *see also Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 250 (2d Cir. 2008) ("We have already found that the district court lacks subject matter jurisdiction over appellants' federal claims. It would thus be clearly inappropriate for the district court to retain jurisdiction over the state law claims when there is no basis for supplemental jurisdiction."); *Karmel v. Claiborne, Inc.*, No. 99 Civ. 3608, 2002 WL 1561126, at *4 (S.D.N.Y. July 15, 2002) ("Where a court is reluctant to exercise supplemental jurisdiction because of one of the reasons put forth by § 1367(c), or when the interests of judicial economy, convenience, comity and fairness to litigants are not violated by refusing to entertain matters of state law, it should decline supplemental jurisdiction and allow the plaintiff to decide whether or not to pursue the matter in state court.").

Accordingly, pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to retain jurisdiction over the remaining state law claims given the absence of any federal claims that survive summary judgment.

IV. CONCLUSION

For the foregoing reasons, the Court grants defendant's motion for summary judgment as to the federal claims. The Court declines to exercise supplemental jurisdiction over the state law claims and, thus, dismisses such claims without prejudice. The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: September 26, 2014
        Central Islip, NY

\* \* \*

Plaintiff is represented by Steven A. Morelli and Paul Bartels, The Law Offices of Steven A. Morelli, P.C., 1461 Franklin Ave, Garden City, NY 11530.  Defendant is represented by Anjanette Cabrera, Littler Mendelson P.C., 900 Third Ave, New York, NY 10022.